### GIBSON v. TEXAS CO.   (No. 2482.)*

(Court of Civil Appeals of Texas. Texarkana. March 21, 1922. Rehearing Denied March 30, 1922.)

**1. Mines and minerals** ⬅109—**Contract to drill for oil and gas held incomplete.**

A written contract to drill for oil and gas without any provision fixing the depth to which a test well should be drilled, or a method whereby such depth was to be ascertained, was incomplete, since it cannot be construed as obliging the contractor to drill the well to whatever depth is necessary to discover oil and gas, which might never be discovered on the premises.

**2. Evidence** ⬅442(5)—**Parole agreement establishing omitted term as to depth of test well is admissible.**

In an action for breach of an agreement to drill for oil and gas on described premises, which was incomplete because it did not specify the depth to which the test well should be drilled, parol evidence was admissible to prove the existence of a valid contemporaneous oral agreement that the depth of the well was to be determined by the reasonable judgment of the driller.

**3. Mines and minerals** ⬅109—**Evidence held to show agreed depth of test well was left to good-faith judgment of driller.**

Parol evidence that the parties to a written agreement as to drilling a test well orally agreed that the depth to which the well should be drilled should be left to the reasonable judgment of the contractor held to establish an oral agreement which obliged the contractor to drill to such depth as in its reasonable judgment, exercised in good faith, would demon-

---

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error dismissed for want of jurisdiction May 17, 1922.

strate that the premises were not productive of oil or gas.

**4. Mines and minerals ⊙⇒109—Evidence held not to show as a matter of law abandonment of test well was in bad faith.**

In an action for breach of a contract to drill a test oil well to such depth as was reasonably necessary in the driller's judgment to demonstrate whether oil or gas could be produced on the premises, evidence *held* not to show as a matter of law that the abandonment of the well was not made in good faith exercised in the driller's judgment, though the driller intended to drill deeper before a drill stem, which had broken off in the well, prevented further drilling.

**5. Mines and minerals ⊙⇒109—Good faith in determining depth to which test well should be drilled is ordinarily question for the jury.**

It is ordinarily a question of fact to be determined by the jury in each particular case whether the driller, acting in good faith, exercised reasonable judgment under all the conditions and circumstances in concluding that the premises were not productive of oil or gas as a result of the test made, so that it was not error to refuse to direct a verdict for plaintiff in an action for breach of the contract to drill, where there was evidence to sustain a finding.

**6. Contracts ⊙⇒9(2) — Cost of drilling test well without specified depth is too speculative.**

Where the contract requiring defendant to drill a test well on designated premises stated no depth to which the well should be drilled, the cost of drilling a well to a reasonably sufficient depth was incapable of reasonable ascertainment, so that it could not be allowed as damages for breach of the contract.

**7. Contracts ⊙⇒330(2)—Plaintiff held not entitled to recover value of leases transferred in consideration of agreement to drill.**

Where plaintiff had acquired oil leases from landowners with the understanding he was to use them to procure the drilling of a test well and was to turn them over to the company which agreed to drill such test well, he cannot, after procuring the drilling of the well and the execution of new leases to the company in place of those to him, recover the value of such leases for the company's breach of contract to drill the test well, since he had no valuable interest in the leases so transferred to the company, but held them in trust for the owners.

**8. Damages ⊙⇒23—Possible profits on other leases in vicinity cannot be allowed for breach of contract to drill property.**

A company which agreed to drill a test well on designated property in consideration of oil leases on a block of land cannot be held to have contemplated as a result of its breach of such agreement that the other party would thereby suffer damage by reason of the diminished market value of the leases held by him on other lands in the vicinity, so that he cannot recover as damages such diminished value, especially where it appeared that he had sold all his other leases before the alleged breach of the contract.

**9. Trial ⊙⇒350(3) — Evidence in suit for breach of contract to drill test oil well held to sustain submission of special issues as to depth.**

In an action for breach of an agreement to drill a test oil well on designated premises, evidence *held* to sustain the action of the court in submitting to the jury special issues as to whether the plaintiff agreed that the depth of the well should be left to the judgment of defendant, and whether defendant drilled the well to such depth as in the exercise of its judgment it thought was necessary to make the reasonable test of the land.

**10. Appeal and error ⊙⇒930(3)—Court presumed to have found defendant exercised good faith in determining test well was deep enough.**

The issue raised by the pleadings and the evidence in an action for breach of a contract to drill an oil well, submitted on special issues, whether the defendant exercised its judgment honestly and in good faith in determining that the test well had been sunk to a sufficient depth, must, on appeal, be deemed, under Rev. St. art. 1985, as found by the trial court in favor of the defendant, for whom the judgment was rendered.

Appeal from District Court, Harrison County; Cary M. Abney, Special, Judge.

Action by Barrett Gibson against the Texas Company to recover damages for a breach of a written contract. Judgment for defendant, and plaintiff appeals. Affirmed.

The action is one for damages brought by the appellant in his own behalf against the appellee for alleged breach of a written contract. According to the terms of the contract, the appellee "agrees to drill the 2,572 acres, more or less, owned by the said Mattie M. Gibson, for oil or gas." And the petition alleges:

(1) That the appellee started a well on the land, but "did not in fact in good faith drill the said 2,572 acres of land, and did not in fact in good faith attempt to successfully complete the test well that was partially drilled thereon for gas and oil"; and (2) "that after drilling the said well to a depth of approximately 2,500 feet, a showing of oil and gas was encountered, but that the said defendant failed and refused to make a test thereof or to endeavor to ascertain whether there was oil or gas in paying quantities, but continued to drill the same to a greater depth, and having drilled the same to a greater depth, and without having made any test for oil or gas, and without having completed the well either as a producing well or a 'dry hole,' junked the said well by permitting a lot of drills, drill stems, casing, and other junk to be detached in the well and did not remove the same therefrom, and that the defendant entirely abandoned the said well in that condition, and without having in good faith drilled it to a completion as a producing well or to a satisfactory depth as a test well."

The petition sought damages in the sum

of $50,000 and based the claim for the same upon the cost of drilling a well such as contracted for, or, in the alternative, upon the value of the leases given for the contract of drilling the well.

The appellee answered by a general denial, and specially pleaded the performance of its contract in good faith and in skillful manner as a prudent oil operator, and that it had made a thorough test for oil and gas in accordance with the contract. Appellee further pleaded, by way of estoppel, an acceptance by appellant of the work and drilling done as a satisfactory compliance with the contract, and the reconveyance of the lease. The appellee further pleaded that the depth of the well and sufficiency of the test for oil and gas was at the time of the execution of the contract left by the appellant to the sound judgment and discretion of the appellee, its agents and employees.

The following special issues were submitted to and answered by the jury:

"(1) Was there a substantial performance by the Texas Company of the contract dated February 11, 1919, entered into between the plaintiff and defendant? Answer: Yes.

"(2) Did the plaintiff agree at the time of the making of such contract that the depth of the well and the sufficiency of the tests should be left to the judgment of the Texas Company? Answer: Yes.

"(3) Did the defendant drill the well on the Mattie Gibson land to such depth as the defendant in the exercise of its judgment thought was necessary to make a reasonable test of said land for oil and gas? Answer: Yes."

In accordance with the verdict of the jury the court entered judgment in favor of the appellee.

Mrs. Mattie M. Gibson, widow, was in possession under legal title thereto of 2,572 acres of land. Appellant is her son, and resides upon the land. The appellant had transferred to him and placed under his control leases to numerous tracts for the purposes of exploring for oil and gas. The tracts of land adjoined and were near the 2,572 acres, constituting a block of tracts of land. And appellant began negotiations with the appellee, with the view of having a test made for oil and gas in that locality, with the result that the parties reached the following written agreement:

"Elysian Fields, Texas.

"This agreement made this, the 11th day of February, 1919, by and between the Texas Company, a corporation organized and existing under the laws of the state of Texas, party of the first part, and Barrett Gibson, of Harrison county, Tex., party of the second part, witnesseth: That for and in consideration of the procurement of the second party of a lease upon the 2,572 acres, more or less, of the Samuel Monday league, owned in fee by Mattie M. Gibson, and the 3,200 or 3,300 acres, more or less, owned by Mrs. E. G. Robertson, and the transfer of such leases to the first party, and the

239 S.W.—43

further transfer by said second party to the first party of all leases taken by the second party or to be taken by him in the future of lands lying within the Samuel Monday survey, in the Jacob Bennett survey, Sylvester Luna survey, Humphreys Elliott survey, Nance survey, J. B. Wray, M. Duncan, Gamblin survey, all said lands being situated in Harrison county, Tex., the said first party agrees to drill the 2,572 acres more or less, owned by the said Mattie M. Gibson, for oil or gas, the lease for said land to be conditioned that drilling operations shall start within four months from the date of this instrument, upon terms to forfeit such lease in the event more than ninety days shall elapse between the completion of one well and the beginning of another. In the event oil or gas shall be found in paying quantities in any well, the first party agrees to prosecute production therefrom and from the balance of said land conveyed by said leases with due diligence."

C. P. Clayton, the agent of the appellee, testified:

"Mr. Gibson wanted the well drilled to 3,000 feet. I told him I would not agree to any specific depth, but that the Texas Company would be governed by the conditions encountered. Then the agreement was written without stating any depth. * * * I am not positive, but my recollection is that I refused to obligate myself (as agent) to go deeper than 2,500 feet, but we would drill further, if we saw fit, to any depth we might be justified, dependent on conditions. Mr. Gibson objected at first, and finally agreed to it, and he drew up the agreement after we had the discussion."

L. B. Webster, for appellee, testified:

"I signed the agreement as a witness, Mr. Gibson wanted to insert in the contract a depth, as I recollect it, of 3,000 feet, and Mr. Clayton would not hear to it. My recollection is that Mr. Clayton or I said that it would have to be left to the judgment of the Texas Company as to the depth the well would be drilled, and Mr. Gibson acquiesced and drew the contract after that statement, and I witnessed it."

The appellant testified:

"It is a fact that I always intended to leave the question of how deep the well should be drilled to the judgment of the Texas Company. At the time the contract was considered the question of depth was mentioned, and they asked me what I thought about it, and the answer I made Mr. Webster and Mr. Clayton was that I knew nothing about an oil well, and I believed they were going to do their best to get one and I wanted them to drill a proper well, and I believed they would do it."

The appellant transferred and procured to be given to the Texas Company the leases mentioned in the contract, all of which aggregated about 7,572 acres. The lease of Mrs. Mattie M. Gibson, on whose land the drilling was to be done, was executed by her to the Texas Company on February 21, 1919, and recites the consideration of $1 paid in cash. The instrument

says, "does hereby lease unto the said Texas Company, a corporation of Texas, the following described land:" [Here follows description of 2,572 acres, more or less]—and stipulates that "so long as it remains in force the lessee shall have the exclusive right to prospect and drill on said land for oil and gas and remove the same therefrom," "subject to the negotiations hereinafter reserved of all the oil and gas in and under said land," which is stated to be one-eighth of the oil, and $200 per annum for gas. Appellant's only interest in this lease of Mattie M. Gibson consists and depends, as he himself says, upon the following letter:

"September 6, 1919.

"My dear Son: Of course I distincty remember my promise to give you a one-fourth interest in the oil lease on the Texas land. You did all the work and gave up all the leases you had taken in order to get my land drilled, and it would be very selfish of me not to divide up with you. You suggested that I assign you and your brother Huntley each one-quarter of my interest, and I fully intended to do it. I thought I had done it, until you wrote me your Uncle George said he had put it off because there was no hurry. I will have him attend to it at once if you wish it. * * * I hope to have a letter at home awaiting me from you.

"Devotedly,          Mother."

The Texas Company began to bore a well on the 2,572-acre tract on May 15, 1919, and bored down to 2,828 feet. They there struck a lime rock and twisted off a drill stem, and did not go any deeper. The general superintendent of the appellee testified:

"When the drill stem was broken off, we fished for it quite a while and were not successful in getting it. Then we tried to sidetrack, but did not succeed. In side-tracking we simply went in the hole with a bit—it is usually done with a diamond point bit—in an effort to get by the side of the drill stem and drill a new hole by the side of the pipe that was left in the hole. We did almost everything that could be done, and tried everything that we thought could get it out. * * * The motive behind the effort to get the drill out was we thought there was a remote possibility of getting the hole to drill to a slightly greater depth. Had we gotten the drill stem out, we would have drilled a little deeper. The well was finally abandoned by my order on April 3, 1920. I recommended that it be abandoned, and they [managing officers of the company] concurred."

The recommendation of the general superintendent follows:

"Shreveport, March 22, 1920.

"J. C. McCue, Houston, Texas: We have failed in our effort to side-track the junk in Gibson No. 1, and we believe it is a waste of time to continue further drilling.

"The junk falls in and sticks the drill pipe and we have spoiled considerable pipe on account of pulling in two when stuck and bottom part dropping and crooking it. Cementing pipe above the junk for a whipstock was not a success.

"Total depth reached on this well 2,820 ft.; top of chalk was found at 1,609 ft., and base of chalk at 2,164 ft.

"On Gulf J. M. Trosper No. 2, which was completed March 6th, as an eight-barrel well, the top of chalk was 1,395; base of chalk 1,785, while the pay was found at 2,412 ft. We are therefore sufficiently deep to have reached this pay in Gibson, if it was there, and we believe there is very little chance of picking up gas that is found near Bethany at around 2,990 ft., as we are so far down on the west dip.

"We have just gotten our drill pipe out of hole, after being stuck again, and will not try side-tracking again until we hear from you.

"Our recommendation would be that we pull casing and abandon. Please wire your advice."

The recommendation was answered by the following telegram:

"Houston, Texas, March 30th, 1921.

"R. C. Stewart, Shreveport, La.: Your telegram twenty-seventh. Think Gibson number one should be abandoned, hole salvaged and material moved off lease, we to take full count of time allowed for commencing of second well, then execute release to property.

"J. C. McCue—2/30 P. M."

The assistant general superintendent of appellee testified:

"I superintended the work from August 1 until we abandoned the well. It was abandoned in the early part of April. If we had succeeded in getting the drill pipe out of the hole I expect we expected to drill deeper. I suppose it was the intention to drill deeper. I had no orders to that effect."

After the appellee had abandoned the well it reconveyed to Mrs. Mattie M. Gibson the oil lease formerly executed by her. There is evidence, though, going to show that the cancellation of the lease was not with the purpose, on appellant's part, of settling any right of his under the contract in suit.

In respect to the leases mentioned in the contract as a part of the "consideration thereof," the appellant testified:

"Negotiations leading up to my contract with the Texas Company began right after I saw the Waterman well. I had a conversation with Mr. Hewitt [of the Texas Company] about the general proposition. The Texas Company sent Mr. Hewitt there, and he stayed at my house a couple of days, and I walked over the country with him. I was interested in getting oil on my land and hoped to interest the Texas Company. I became interested because of Waterman No. 4, and thought that the Texas Company would be interested for the same reason. That is why I opened negotiations with the Texas Company. * * * At that time I was not interested in buying and selling leases. I had actually acquired a large number of leases, approximately 10,000 or 12,000 acres acquired or controlled; but I had gotten those with the distinct understanding that I would take them and turn them over to some oil company that I could get to come there and drill. I was not trading in oil leases. I made this block at the request of the Texas Company and held it for

them. Prior to the time this contract was made the Texas Company required me to block up this acreage, and I held it for them so that their geologist could look it over. There was no contract with me at that time. I understood that if they were impressed with it they would take it. At the time this contract was signed I had leases actually executed and delivered from [here follow names and acreage aggregating 1,736 acres]. Those were the only leases I had actually executed and delivered to me and in my possession at the time the contract was written. I had the leases and gave them to the Texas Company, and they requested that the leases executed to me be exchanged for leases direct from the owners of the land to the Texas Company, and that was done in every instance. I was glad to give up my leases to the Texas Company. I got them for that purpose. * * * I paid nothing for the Mattie Gibson lease nor for any other lease gotten for the Texas Company. I had no lease on the Robertson property, but had an agreement with Dr. Mahon that he would get the lease for me. I had a one-fourth interest in my mother's royalty at that time. It was never assigned to me. Such interest as I had in any royalty was contingent upon getting a well on her property. * * * The leases I identify (holding in my hand) and which now show to be in the Texas Company were handled in this way: The Texas Company asked me to get all the parties [lessors] together and I did so, and Mr. Reddick for the Texas Company told the lessors that he wanted the leases direct to the Texas Company and would pay 50 cents per acre for them, and that the lease to me would be returned back to each lessor."

The appellant further testified as to acquisitions of other leases after the contract was signed, and not a part of the leases recited as a part of the consideration of the contract in suit. He testified:

"Before the operations of drilling the well began, and after the contract to drill the well was made, I acquired other leases north of the place, about two miles from the well. All the leases did not join my mother's place. Some did. They were as close to the well as I could get them. None of the leases I had provided for renewals. The consideration was the drilling of a well within five miles of Eight-Mile creek. Mr. Furrh and I got a good many leases in there and sold nearly all of them in Shreveport. Some leases we did not sell. We sold a good number. I don't know who to, but I sold the Gulf Production Company the most. I sold some to the Louisiana Refining Company. All of the leases sold to the Gulf Production Company was for $2 per acre and carries to us a one twenty-fourth royalty. All of the Gulf leases were sold on that basis. My understanding is we sold them 1,400 acres of leases, and whether or not that royalty attached to all of them, I don't know. I think we got $2 per acre and a one twenty-fourth royalty. I had no leases at that time [abandonment of the well] except royalties retained in the Gulf leases."

It was shown that acreage, as oil leases, was worth $3 per acre. It was shown that "the reasonable cost of drilling a well on the Mattie Gibson lease at the time this well was abandoned, taking into consideration the ordinary mishaps usually encountered in drilling a well of that kind," was estimated to be $25,000 to $35,000. It was further shown that large producing gas wells at Bethany, about 10 miles distant, were found at 2,990 feet, with elevation about 100 feet lower than on the Gibson tract. Oil-producing wells were located, it was shown, in distances from 17 to 50 miles from the well in suit.

Jones, Sexton & Jones, of Marshall, for appellant.

Davidson & Blalock, of Marshall, for appellee.

LEVY, J. (after stating the facts as above). [1] Appellant asked and the court refused to give the peremptory instruction:

"You will return a verdict for the plaintiff for the reasonable cost at the time the contract was breached, about April 1, 1920, of drilling to completion a well for gas or oil on the said Mattie M. Gibson land."

It was not error to refuse, it is believed, to give the instruction. By the contract in suit, as it is expressed in writing, the Texas Company obligated itself "to drill the 2,572 acres, more or less, owned by said Mattie M. Gibson, for oil or gas."

Appellant was neither the owner nor the lessor of the land. Appellee did hold a leasehold estate in the land, and was to do the drilling at its own expense and without repayment by appellant. It is clear that the main object of the contract, or the purpose which the parties sought to accomplish, was "to drill" or bore a well or wells on the particular land in the hope of finding oil or gas. The undertaking was merely for exploring purposes. The general statement "to drill the 2,572 acres for oil or gas" could not reasonably be held to have been intended by the parties to obligate the appellee to go on drilling the well or wells to an indefinite depth in the ground until oil or gas was certainly found. That would be construing the contract as a warranty or guaranty on appellee's part that gas or oil would be found on the land. Such construction would not be a fair one; for from the very nature of the subject-matter, which must be considered as a matter of common knowledge, it might be impossible to find oil or gas on the particular land. Therefore it must be presumed that the parties knew and contemplated at the time that, although reasonable and honest effort be made to discover the presence of oil or gas, the endeavor might fail of success, and that the land might not be productive of either oil or gas, and that further drilling might have to be stopped as useless if no oil or gas was found. But the contract does not say that the appellee is at

liberty to discontinue operations and abandon further drilling. Nor does the contract state at what depth the appellee shall cease further drilling as useless if oil or gas shall not be found after reasonable and honest effort is made to find it. Nor does the contract state who is to say when appellee shall stop further drilling as useless. Neither does the written contract stipulate, nor can it be implied from the words used, that the exploration or tests made to find oil or gas shall be made to the satisfaction or final approval of either the appellant or the appellee. Therefore neither party can assume to be the arbiter, in virtue of any term of the written contract, of the extent to which the drilling shall proceed and then cease, and the lessee driller be excused from his obligation as fulfilled. The written contract, then, on its face, is indefinite, and is not couched in such terms as express or import a completed legal obligation without any uncertainty as to the subject-matter or extent of the engagement in all its essential terms for performance and fulfillment. The writing is conclusive only so far as it goes; and because it is incomplete on its face the parol evidence rule is not violated by allowing proof, as here done, of an oral agreement or representation on the faith of which the contract was made, made during the negotiations at the time the contract was entered into.

[2, 3] The parol evidence rule permits the party to prove the existence of a valid contemporaneous oral agreement as to any matter on which the written contract is silent and which is not inconsistent with its terms. 2 Greenleaf on Evidence, § 282; 3 Jones on Evidence, § 439; 2 Page on Contracts, § 1197; 6 R. C. L. p. 856; Magnolia Warehouse & Storage Co. v. Davis & Blackwell (Tex. Civ. App.) 153 S. W. 670; Kelly Plow Co. v. London (Tex. Civ. App.) 125 S. W. 974; Life Ins. Co. v. Ballard (Tex. Civ. App.) 122 S. W. 267; Sherman Oil & Cotton Co. v. Dallas Oil & Refining Co. (Tex. Civ. App.) 77 S. W. 961. And, looking to the evidence, the parties appear to have orally agreed or consented, during the negotiations, that the depth of the well and the manner of drilling it should be left to the reasonable judgment of the appellee. The appellant testified that he did so. We conclude, then, that in connection with the express agreement contained in the written contract to sink a test well on the land for oil or gas there is the further agreed term of the parties to be considered that the depth of the test well and the manner of drilling it should be left to the reasonable judgment of the Texas Company. Giving the legal effect attaching to the entire contract thus made, the appellee was obligated to drill a test well on the premises for oil or gas to such depth as in its reasonable judgment exercised in good faith would demonstrate and prove, in the absence of finding oil or gas, that the premises were not productive of oil or gas. The law would require that the appellee exercise its reasonable judgment in good faith, under the circumstances, in concluding to discontinue further drilling as useless, if oil or gas be not found. Therefore, under terms of the contract, the appellee had the option to terminate the contract, acting in good faith, when according to its reasonable judgment further drilling became a useless search for oil or gas. The legal right, then, of appellant to complain or disagree about the sufficiency of the depth of the test well would arise only when he had shown that the appellee did not exercise its reasonable judgment in good faith under the circumstances and conditions in evidence, but fraudulently. Appellant's pleading seems to follow this construction and predicate a right of recovery on failure to exercise "good faith" in ceasing further drilling. If the appellee exercised reasonable judgment "in good faith," to be determined from the circumstances, then its obligation was fulfilled and the contract ended.

[4] In this construction we make of the contract, and of the rights and duties of the parties thereunder, the vital question for decision is: Do the facts show, as a matter of law, as insisted by appellant, that the appellee has failed of compliance on its part with the terms of the contract, in that the cessation of operations and the abandonment of further drilling below 2,828 feet was not in good faith on its part? Appellee abandoned further drilling below 2,828 feet, claiming that it had in the utmost good faith and with reasonable care and diligence entered and explored the premises for oil and gas by drilling a test well to a depth to sufficiently demonstrate and prove that the premises were not productive of either oil or gas. The appellant, suing for damages, claims that the appellee "did not in fact in good faith drill the 2,572 acres, and did not in good faith attempt to successfully complete the test well that was partially drilled thereon for gas or oil."

[5] It is ordinarily a question of fact to be determined by the jury in each particular case, and so in this case, whether or not the lessee driller, acting in good faith, exercised reasonable judgment under all the conditions and circumstances in evidence in finally concluding that the premises were not productive of oil or gas as a result of the test made. The lessee, itself doing the drilling, had as much incentive and interest to actually discover oil or gas as the appellant. It had expended a large sum of money in drilling. There is evidence that appellee's superintendent intended "to have drilled deeper," as he says, "had we gotten the drill stem out." But there is also the further

evidence tending to show that the well was abandoned finally upon the conclusion that it was "sufficiently deep to have reached this pay in Gibson [the name of the well] if it was there, and we believe there is very little chance of picking up gas that is found near Bethany at around 2,920 feet, as we are so far down on the west dip." Further, it appears, character of the dirt and formations were apparently considered in reaching the conclusion to abandon further drilling as unproductive of oil or gas. All these circumstances tend to show good faith and to make an issue of fact.

[6] Further, we think the court did not err in refusing the peremptory instruction, because the damages mentioned therein were not such, we conclude, as could be legally awarded appellant for the breach of the contract, if it has been breached. The cost and expense "of drilling to completion a well" is not the measure of damages that can legally be applied to a contract of the kind here in suit, especially so under the evidence in this case. The damages sought as compensation cannot be ascertained with reasonable precision. The contract has no stipulation of any specific depth for the test well to be dug, and any precise or specific depth a test well should be drilled is purely speculative or contingent in its nature. Appellant has shown no right or title in the land nor in the well itself. The real object of the contract, as between appellant and appellee, was to search for oil or gas believed to be in the land. Appellant's chief interest and purpose, it appears, in having the well drilled, was that of ascertaining whether an oil field existed in that vicinity. It was an ascertained fact that no oil or gas was struck at the depth of 2,820 feet to which the well was drilled, and consequently no actual present loss or damage in not having an oil field developed was suffered by appellant at that depth. To prosecute the work still further and deeper in the hope of discovering either an oil or gas field is the merest matter) of speculation, as a ground for damages. The evidence does not show how deep the well should be drilled to be a compliance with the contract, and neither could it be shown, except by actual discovery, that oil or gas would be found by drilling deeper than was done. To fix damages at the cost of drilling a well to a "reasonably sufficient depth" would require a finding by the jury of what was "a reasonably sufficient depth" to fairly demonstrate whether or not there was oil or gas, which is purely speculative, as grounds for damages. In all the cases, including those cited by appellant, where the recovery of damages for failing to dig the well is placed at the cost and expense of drilling same to the depth contracted for it is where the contract specifically called for a certain depth to which the oil well should be drilled. In the case of North Healtdton Oil & Gas Co. v. Skeeley, 59 Okl. 128, 158 Pac. 1180, cited as a typical case by appellant, the contract expressly provided "for a well to a depth of 1,750 feet," and later in writing it was "agreed to drill the well to a further depth of 200 feet." Also in the case of Ardizonne v. Archer (Okl.) 178 Pac. 263, the depth to which the well was agreed to be drilled was according to the stipulation fixed, and not uncertain. But a claim for damages as compensation is too broad and uncertain of reasonable ascertainment where the covenant, as here, is to dig a test well according to the reasonable judgment of the lessee driller under the conditions encountered in drilling. The rule is general and clear, as laid down in 8 R. C. L. p. 438:

"The damages recoverable in any case must be susceptible of ascertainment with a reasonable degree of certainty, or, as the rule is sometimes stated, must be certain both in their nature and in respect to the cause from which they proceed. Therefore uncertain or speculative damages cannot be recovered either in actions ex contractu or in actions ex delicto."

Accordingly appellant would be legally entitled to recover only the damages he suffered, if any, measured by any definite, ascertained and computable loss, not speculative in character, that has come to him by reason of the breach, if it occurred, of the contract.

[7] In this connection it would facilitate the decision of this case, and as well answer appellee's cross-assignment of errors, to determine the right of appellant to recover the other damages pleaded as occasioned to him by the breach of the contract, if it existed. The next damages pleaded by appellant, being the value of the leases he owned and parted with to appellee as the consideration for the contract of drilling the well, would undoubtedly be the legal measure of damages for the alleged breach of the contract if the evidence had tended to show that appellant himself had a title to or an interest in the leases used and which constituted "the consideration" for the contract. But the evidence does not, we think, so show. He was a trustee, taking the leases under an agreement with the owners to convey the same to oil companies for development. He testified:

"I had actually acquired a large number of leases, approximately 10,000 or 12,000 acres acquired or controlled; but I had gotten those with the distinct understanding that I would take and turn them over to some oil company that I could get to come there and drill. I was not trading in oil leases. I made this block at the request of the Texas Company and held it for them. Prior to the time this contract was made the Texas Company required me to block up this acreage, and I held it for them so that their geologist could look it over.

* * * At the time this contract was signed, I had leases actually executed and delivered to [about 1,736 acres]. I had the leases and gave them to the Texas Company. I got them for that purpose."

And appellant, as seen, carried out the trust in transferring the legal title placed in him as trustee of the leases to the Texas Company. And then afterwards, it is shown, the beneficial owners of the leased land themselves, with appellant's consent, executed leases direct to the Texas Company. Appellant testified:

"And they [the Texas Company] requested that the leases executed to me be exchanged for leases direct from the owners of the land to the Texas Company, and that was done in every instance."

As the trust had been executed, the trustee had no longer any interest; and, appellant having no inherent or personal right to damages for the value of the leases, he cannot recover for same.

[8] Appellant next pleaded and claimed damages in the value of his interests and holdings in the gas and oil royalties appearing in evidence. This claim is predicated upon the acquisition of leases other than those specified and parted with in the consideration of the contract in suit, subsequent to the making of the contract. Appellant and another person, it appears, together obtained leases north and about two miles from the well in question. These leases, though, were all sold at the time of the alleged breach of the contract. Appellant testified that at the time the well in suit was abandoned "I had no leases at that time except royalties retained in the Gulf leases." In selling the leases to the Gulf Production Company there was retained, appellant says, "to us (meaning himself and Mr. Furrh) a one twenty-fourth royalty. I think we got $2 per acre and a one twenty-fourth royalty." By this evidence appellant had parted with all his estate in the leases except a one twenty-fourth royalty. Of course, royalty is only a percentage of the oil after it is found on the particular tract of leased land. Abandonment of the contract in suit worked no forfeiture of the estate in the royalty fixed and retained in these leases of appellant. Therefore, if appellant suffered any injury, it was in the nature of special damages in the lessened market price at which his royalty interest as a property right could be sold or assigned after the breach of the contract in suit. But such loss of lessened market price, if any occurred, which is not proven, is not such damage as the appellee could be held legally liable for in this case. It was no part of the contract in suit that appellant should have the opportunity to go out and buy leases after the contract was signed, and should make profits in reliance on the said contract. The contract in suit was not made for the purpose of enabling appellant to subsequently buy other leases; nor was such mutually contemplated or necessarily contemplated by the parties to said contract. As such damages were not such as may fairly be supposed to have mutually entered into the contemplation of the parties, and were not such as might naturally be expected to follow a violation of the contract itself, the appellant cannot recover therefor. Consequently it appears in the record that appellant has shown himself entitled only to nominal damages, even if there were a breach of the contract.

[9] Appellant next insists that the court erred in submitting the special issues following:

"Did the plaintiff, Barrett Gibson, agree at the time of the making of such contract that the depth of the well and the sufficiency of the tests should be left to the judgment of the Texas Company?

"Did the defendant drill the well on the Mattie Gibson land to such depth as the defendant in the exercise of its judgment thought was necessary to make reasonable test of said land for oil or gas?"

The evidence was not conflicting, and appellant substantially admitted that he acquiesced and consented to leave the depth of the well and the manner of drilling it to the reasonable judgment of the Texas Company. As before stated, we think the evidence was admissible, and there was no error in giving the instruction. As such agreement became a term of the contract, the appellee, in virtue of such term of agreement, had the right to cease further drilling when in the exercise of its reasonable judgment further drilling in search of oil or gas became a useless endeavor. Therefore the other issue was not affirmatively erroneous. The special charges in this respect asked and refused embodied the same issue in substantially the same language as the issue submitted by the court.

[10] As the contract committed to the reasonable judgment of appellee and made it the arbiter of the extent or depth that the drilling of the test well should proceed in the search for oil or gas and then cease, in the absence of finding oil or gas, as a useless endeavor, its determination of what is reasonable in the way of continued exploration is conclusive, if made honestly and in good faith. The question, then, in the case, made both by the pleading and the evidence, was that of whether or not the appellee, in the circumstances and conditions appearing exercised its judgment in the way of continued drilling or exploration honestly and in good faith. Under article 1985, R. S., this issue must, on appeal, be deemed as found by the trial court; there being evidence to sus-

tain the finding in favor of appellee. The case therefore, on the whole record, must, we conclude, be affirmed.

There are no reversible errors, we think, in the remaining assignments of error, and they are each overruled.

---

⊚⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
\*Writ of error refused May 10, 1922.