## DE LANGE v. OGDEN et al.

### No. 10009.

Court of Civil Appeals of Texas.   San Antonio.

May 12, 1937.

Rehearing Denied June 16, 1937.

Swearingen & Miller and Mueller & Green, all of San Antonio, for appellant.

Bryan, Suhr, Bering & Bell, of Houston, for appellees.

SLATTON, Justice.

Appellees, Ogden, Hamill, and Smith, sued appellant, Rodney DeLange, in the district court of Duval county, Tex., for title to and possession of an undivided one-half interest in two oil leases, commonly designated as the Bishop Cattle Company and Moody leases. Said leases covered valuable producing oil lands situated in said county. The value of one-half interest in and to said leases was alleged to be $300,000.

Appellees alleged that they were entitled to the one-half undivided interest in and to said leases in virtue of an oral contract alleged to have been made by Ogden, on behalf of appellees, and the appellant, on or about March 25, 1935. It was alleged that by the terms of said oral agreement appellant agreed that, in consideration of appellees' agreement to drill a well in the southwest corner of section 77, in Duval county, Tex., and to pay one-half of the expenses of acquiring leases, appellant would undertake to acquire oil leases in the vicinity of said location, and that appellees would own a one-half interest in such leases which appellant might thereafter acquire.

Appellees further alleged that the Bishop and Moody leases were procured by appellant subsequent to the date of said oral agreement, and that they were situated within the vicinity of the southwest corner of section 77, and that appellees had complied with their obligation to drill, and had drilled a producing oil well in the southwest corner of section 77.

Appellees also alleged that appellant fraudulently induced one of appellees to sign a letter, dated April 9, 1935, whereby appellees agreed to drill said well in the southwest corner of section 77, and in consideration of the same appellant would assign to appellees an oil lease on 33 acres in the name of C. W. Hahl, in section 78, and an oil lease on a 40-acre tract out of a portion of section 76; and further that appellant would endeavor to procure an oil lease on the 7 acres known as the Eckdahl tract.

Appellees further alleged that before and at the time said letter was obtained, on April 9, 1935, appellant fraudulently represented to appellees that said two leases, together with two others kept by the appellant, were all of the leases which appellant had been able to obtain in the vicinity of the southwest corner of section 77, and further frauduently concealed from appellees the fact that the Bishop lease had been procured, and that the Moody lease was intended to be procured. Further, that at the time said letter was procured and obtained by appellant, there existed a relation of trust and confidence between the appellees and appellant, and that appellant was appellees' trustee and was under a legal duty to disclose all material facts in regard to the subject-matter involved.

Appellant answered by demurrers and general and special denials, specifically denying that the oral agreement as aforesaid was ever entered into, and specially alleged that by the written contract, dated April 9, 1935, appellees obligated themselves to drill a well 330 feet each way, out of the southwest corner of section 77, drilling to begin just as soon as a certain rig could be moved on the location, and the drilling to proceed with due diligence to a depth of 3,000 feet, unless oil be found at a lesser depth. That in consideration for the drilling of a well, appellees were to receive the two oil leases mentioned, that is, the 33-acre Hahl lease, and the 40 acre lease out of section 76; and that appellant would endeavor to obtain a lease on the 7-acre Eckdahl tract, and, if successful, thereafter would assign the same to appellees.

Appellant further alleged that the written contract had been fully performed by all parties and denied any fraud in connection with the procuring of the same, and alleged the disclosure to appellees of all material facts in regard to the Bishop and Moody leases.

Appellant also pleaded the statute of frauds (Vernon's Ann.Civ.St. art. 3995) as

against the alleged oral contract of March 25, 1935.

Appellant further alleged the expenditure of large sums of money in the development of the Bishop and Moody leases and alleged knowledge thereof on the part of appellees, and that appellees made no demand for any interest therein until long after the expenditure of such money.

By supplemental petition and trial amendment, appellees renewed their allegations of the oral agreement and their allegations of fraud relative to said written agreement dated April 9, 1935.

The case was tried and submitted to a jury upon special issues. The jury found, in effect, that an oral agreement was made on or about the 25th day of March, 1935; that it was made prior to appellant's acquisition of title to the Bishop lease; that appellant agreed that appellees should own a one-half interest in the Bishop and Moody leases; that at the time of the signing of the written contract of April 9, 1935, appellant concealed from appellees Hamill and Smith the fact that appellant had a contract to acquire the Bishop lease and intended to acquire the Moody lease; that appellees made demand on defendant for an interest in the Bishop and Moody leases, within a reasonable time after they received notice that appellant owned them; that appellees Hamill and Smith would not have given appellant the contract of April 9th had appellant disclosed to them that he had a contract for the Bishop lease and intended to acquire the Moody lease; that a reasonable man, under the circumstances, would not have inquired of appellant, at the time the written contract was signed, on April 9th, what leases appellant had in the vicinity of the southwest corner of section 77; that appellees were materially injured as a result of the fraudulent concealment; that appellees did not intend by any delay in making demand to waive any of their rights; and that the parties to the written contract of April 9th did not intend that said written contract should take place of the oral agreement on or about the 25th of March, 1935.

Upon these findings by the jury, the trial court rendered judgment that appellees have and recover the title to and possession of a one-half interest in and to the Bishop and Moody leases, valued at $300,000, and also made allowance to appellant for valuable improvements.

Appellant, being dissatisfied with this judgment, brings the case here, claiming as his right for reversal thirty-one propositions of law.

█ We are met at the threshold of this case with appellees' motion to dismiss this appeal. The motion of appellees to dismiss this appeal was filed in this court on March 10, 1937; the statement of facts and the transcript in this case were filed in this court on March 28, 1936. The substance of appellees' motion to dimiss is, that appellant, DeLange, by filing suit and prosecuting the same to judgment in the Seventy-third district court in and for Bexar county, Tex., with reference to the oil runs involved in the Bishop and Moody leases, involved in this suit, thereby accepted a benefit provided for by the judgment appealed here.

Rule 8 of the Court of Civil Appeals requires that motions relating to informalities in the manner of bringing a case into court shall be filed within thirty days after the filing of the transcript, otherwise it is waived.

Rule 9 provides that motions to dismiss for want of jurisdiction, or for such defects as defeat the jurisdiction in the particular case, shall be filed within the same time, that is, thirty days after the filing of the transcript in the Court of Civil Appeals; "provided, however, if made afterwards they may be entertained by the court upon such terms as the court may deem just and proper."

It is not necessary to cite authorities that appellate courts of this state guard jealously the right of appeal of all parties. We think that the appellees waived any right they had by not timely filing their motion seeking to dismiss the appeal. The matters set up by them, which they say entitled them to a dismissal occurred on June 15, 1936, and yet they present their motion here on March 10, 1937. Furthermore, we think the grounds set up in the motion are without merit. The record in the suit filed by appellant, DeLange, in the Seventy-third district court in and for Bexar county, Tex., does not claim under and in virtue of the judgment in this cause, and has no relation to the same, save and except he was claiming all of the oil runs, and not an undivided one-half interest in them, as is provided for in the judgment appealed from by him. Furthermore, the provision of the judgment appealed in this cause, with regard to the allowance for

one-half of the expenditures made by De-Lange in the development of the leases involved, is not a benefit provided to him, but is a provision of natural justice required to be done by the courts in a situation as presented in the record before us.

For the reasons above stated, that is, that the appellees by delay waived any right they may have had for a dismissal of this appeal, and for the reason that the same was without merit, appellees' motion asking that this appeal be dismissed is overruled.

By his first nine propositions, appellant assails the evidence of the oral agreement as proved, for the reason that it was too indefinite and uncertain in its terms to constitute a contract, and that said agreement was lacking in mutuality of obligation; that its performance was optional with appellees and lacking mutual assent of the parties. The alleged oral agreement, forming the basis for the parol trust, was made on behalf of appellees Hamill, Smith, and Ogden, by Ogden, that is, the alleged oral agreement was testified to by Ogden alone, and it was upon Ogden's evidence that the alleged oral agreement was attempted to have been established. Ogden claims that he was at the Plaza Hotel in the city of San Antonio and went to appellant's, DeLange's, room to discuss oil matters with him, some time during the month of March, 1935. Ogden testified that he told DeLange that appellees had a "refusal" on the west one-half of section 77 in Duval county, from Pure Oil Company, and that DeLange remarked that "he could get" several hundred acres down there to offset the southwest corner of section 77, if appellees could drill a well in that corner, and in the discussion of what he, DeLange, thought he could do, DeLange mentioned several tracts of land on which he could acquire leases, including the Highland Oil Company tract, School-field and Frazier, Hahl, Moody, Bishop, and other tracts, including some acreage owned by a party in California, a Mr. Eckdahl. That all of this acreage was within a mile or a mile and a quarter of the well appellees contemplated drilling in the southwest corner of section 77. Ogden designated this conference with De-Lange, in the first part of his testimony, as a discussion. He was later prompted by a leading question by his counsel to "go ahead and continue with the agreement you had with him (meaning De-Lange) at that time." Ogden replied: "I told him if he could get this acreage together, we would drill the well. The proposition was that we could have undivided one-half interest in all the acreage he acquired."

Ogden was further asked by his counsel what DeLange said as to whether he had or would acquire these leases. Ogden answered that he, DeLange, said that he could acquire them, "I think he had a verbal contract on some of them. I don't think there was anything in writing at that particular time." Ogden was further asked why DeLange was interested in a well being drilled in the southwest corner of section 77. He replied: "In order to validate his leases." Ogden further testified that DeLange told him that he had to have a well drilled at that place in order to validate his contract for leases. Ogden's counsel asked him what was the consideration DeLange was to pay for the leases; Ogden answered, "He said he didn't know what particular acreage he could acquire, but said some of it he would have to pay for." Ogden further testified that the purpose of drilling a well in that corner was for the purpose of proving up the territory. Ogden was further asked a leading question about what he, Ogden, said about sharing expenses and acquiring the lease, and he answered: "I told him we would pay half of all expenses he was out acquiring the leases." And when asked as to how much acreage DeLange referred to, Ogden testified that he said, meaning DeLange said, "seven or eight hundred acres to begin with." As to when the conversation occurred, Ogden said that he was unable to fix the date, but it may have been the early part of March.

On cross-examination, Ogden, in an effort to fix the time, was asked if his petition did not allege on or about March 25th, and Ogden testified that he could not give the exact date, but that it was while they were drilling the well in section 41. (That well was begun in February and was not completed until after the execution of the written contract of April 9, 1935.) He further admitted that he had testified on the hearing of the plea of privilege, which was heard prior to the trial of the cause, that it must have occurred in the latter part of March, 1935.

Ogden further testified, on cross-examination, that the lease on which the appel-

lees were to drill the well was not owned by Hamill, Smith, and Ogden, and the record shows, without dispute, that this lease was not acquired by said partnership during the month of March, 1935, and one of the other partners testified that this "refusal" was not a valid option and was not an enforceable right against the Pure Oil Company, and that if that company had insisted upon a hard deal, that appellees would not have taken the lease under any circumstances.

Ogden testified that he had been in the oil business for 38 years and owned producing oil wells. He admitted that in the conversation with DeLange that DeLange said "he thought he could get together a bunch of leases," but DeLange did not say what acreage he could get, that is, nothing definite. And on being asked whether as an experienced oil man he made a binding verbal agreement at that time with DeLange, Ogden replied: "I told Mr. DeLange that he would drill the well in the southwest corner of Section 77, if he could get the acreage." And on being asked as to how much acreage DeLange promised to get, he testified that he did not stipulate, and, further, if DeLange had not gotten any acreage, appellees would not have drilled the well.

On further cross-examination he was asked: "You didn't make any positive agreement about drilling the well, did you?" Ogden replied, "If he could get the acreage, we would." As to how much acreage "he (DeLange) didn't say. He didn't know." And on being asked the question, "Suppose he had gotten only 20 acres, would you have felt that you had made a definite, binding agreement to drill?" Ogden replied, "I don't think so." Then Ogden was asked the question: "The conversation you had with Mr. DeLange was not a matter of preliminary negotiation, was it?" and Ogden answered, "Yes, sir."

Then, in answer to the question whether in that preliminary conversation he positively committed appellees to drill the well whether Mr. DeLange got one acre or 800 acres, Ogden answered: "No, I did not."

Upon being asked the question: "You would have been bound if he got only a 20 acre tract," Ogden answered, "I do not think that anybody I had much confidence in would ask me to do that." Ogden further testified that DeLange did not know how much acreage he could get; he did not know what he would have to pay for it; he did not know what override there would be; he did not know what oil payments would have to be made; he did not know how many wells he would have to drill, nor what the cost would be. Ogden was then asked whether, as a man experienced in the oil business, irrespective of such uncertainties, he agreed and promised at that time to drill the well for one-half of such leases as DeLange might obtain on such terms as might be made by him, and Ogden answered: "There is not an experienced oil man who would do that."

Ogden was further asked, in view of his long experience in the oil business, if it was not suggested by him that a written contract be drawn up. He said that it was never suggested, and when asked why, he said, "Because no written contract could have been drawn up. He didn't know what acreage he could acquire." Ogden testified the proposition was that we could have an undivided one-half interest in all the acreage DeLange acquired.

We have searched Ogden's testimony throughout and he never testified DeLange agreed to that. Ogden, on being interrogated as to whether or not he reported the agreement to his partners, Hamill and Smith, stated that he did not tell them he, Ogden, had definitely agreed to drill, but would if he, DeLange, would get seven or eight hundred acres together.

Nowhere in Ogden's testimony was any time fixed for the commencement of the well, nor the length of time when the well must be completed; there was no testimony given by Ogden in an attempt to indicate how deep the well was to be, nor was there any standard agreed upon to determine the depth, or manner of drilling.

On April 9, 1935, appellees and appellant entered into a written contract which is as follows, to-wit:

"Claud B. Hamill         R. E. Smith
        "Hamill & Smith
        "Oil Operators
    "2109 Second National Bank Bldg.,
        "Houston, Texas
              "April 9, 1935.
"Mr. Rodney DeLange, Plaza Hotel, San Antonio, Texas.

"Dear Sir: Confirming our conversation, we agree to drill a well 330 feet each way out of the Southwest corner of

Section 77, Duval County, on a lease which we are obtaining from Pure Oil Company.

"Actual drilling on this well is to start immediately following completion of a well now being drilled for us by E. R. Thomas in Section 41, either as a commercial producer or a dry hole. Said well shall be drilled to a depth of 3,000 feet unless oil or gas be found in commercial quantities at a lesser depth.

"In consideration of our drilling this well at the above mentioned location and within the time specified, you agree to assign to us the following oil and gas lease: (1) an oil and gas lease covering 33 acres from C. W. Hahl company to you and situated in the southern part of a 200 acre tract in Section 78; (2) an oil and gas lease from Rosita Oil Company covering 40 acres, being the NE 1/4 of the NW 1/4 of Section 76.

"It is understood this latter lease is in escrow in the Alamo National Bank, San Antonio, under agreement to commence a well at the above mentioned location on or before April 27th, and our agreement is subject to you obtaining an extension of time from the Rosita Oil Company, so as to protect us in the event it is impossible for us to complete the well we are now drilling in Section 41 and commence actual drilling in Section 77 by April 27th.

"You agree, if you are able, to obtain the lease on 7 acres of the J. Eckdahl land, that this is also to be assigned to us.

"Enclosed is a copy for your acceptance. "Yours truly,
"Hamill & Smith
"By Claud B. Hamill."
"Accepted: Rodney DeLange

■ In 10 Tex.Jur., page 26, paragraph 12, it is said: "One of the essential elements of a contract is the voluntary assent of the parties thereto. Without such assent there can be no contract." Citing authorities.

■ In paragraph 13, on page 27, it is said: "To constitute a contract the minds of the parties must meet with respect to the subject matter of the agreement and as to all of its essential terms; and all of them must assent to the same thing, in the same sense, at the same time." Citing authorities.

These rules are elementary, and we have heretofore pointed out that the evidence given by Ogden, construed in its most favorable light to sustain the findings of the jury with reference to the oral agreement in question, does not show an oral contract that is the mutual assent of appellant and appellees. Neither does it show mutual assent of the parties to the same thing, in the same sense, at the same time. It goes no further than a preliminary oral negotiation.

■ We are also of the opinion that the oral evidence of Ogden in attempting to establish an oral contract is insufficient on the grounds of uncertainty. 13 C.J., Contracts, 266, § 59; Gibson v. Texas Co. (Tex.Civ.App.) 239 S.W. 671; Texas Employers' Insurance Ass'n v. Moore (Tex.Civ.App.) 56 S.W.(2d) 652; Yerion v. Allison (Tex.Civ.App.) 242 S.W. 270; Summers v. Mills, 21 Tex. 77, 78; Cannaday v. Martin (Tex.Civ.App.) 98 S.W. (2d) 1009; El Paso Gas, Electric Light & Power Co. v. City of El Paso, 22 Tex. Civ.App. 309, 54 S.W. 798; Gordon v. Emerson Shoe Company (Tex.Civ.App.) 242 S.W. 791.

It is not definite as to the amount of acreage which DeLange obligated himself to acquire; it is not definite as to the kind of an oil and gas lease DeLange obligated himself to acquire; it is vague and indefinite as to what the expenses would be that were to be shared one-half by DeLange and one-half by appellees; it is not shown whether these were the traveling expenses of DeLange or whether the expenses meant the purchase price for the leases, or both. It is also vague and indefinite as to whether or not DeLange could contract for drilling in consideration of obtaining leases and as to who would be obligated to pay for such drilling. It is vague and indefinite as to the exact location of the well to be drilled in the southwest corner of section 77. No time is stated when the well is to be commenced and no depth is given to which the well should be drilled. In a contract such as this, generally, the time of the commencement of the drilling of the well is a very important phase of the agreement. The depth that the well must be drilled is also important, particularly is this true for the reason that the appellees alleged in their trial pleadings that this was wildcat territory, and therefore it would be indefinite as to how deep a well should be drilled in an exploration contract for oil and gas.

Appellees contend that if we will consider all of the attending facts and cir-

cumstances surrounding the parties at the time of making the alleged oral contract, that certainty may be obtained, and press upon us the contract letter dated March 27, 1935, directed to R. F. Schoolfield and F. M. Frazier and signed by DeLange. This is extremely difficult for us to do, for the reason that Ogden testified that the oral agreement was made prior to the 25th day of March, 1935, and it appears ,that the Schoolfield-Frazier letter was dated two days after the 25th day of March, 1935. The record shows also that on March 16, 1935, appellant obtained a contract for the Bishop lease, which required him to drill a well on or before July 1, 1935; and it appears that the drilling of the well in the southwest corner of section 77 would not satisfy the Bishop lease. It follows, therefore, that to take these matters into consideration would confuse rather than make certain.

We think, also, that the evidence is insufficient to establish mutuality of the alleged oral contract. 13 C.J., Contracts, 331 to 334; National Oil & Pipe Line Company v. Teel, 95 Tex. 586, 68 S.W. 979; Friedsam v. Rose (Tex.Civ.App.) 271 S.W. 417; Bean v. Holmes (Tex.Civ. App.) 236 S.W. 120.

The appellees seek to avoid the want of mutuality of their oral contract on account of a claimed performance on their part. We think their position is unsound, for two reasons: First, the record is silent as to any performance on the part of either of the parties during the month of March, when the appellees claim the oral contract was entered into, and up until the 9th day of April, 1935, when the written contract was entered into; second, the drilling of the well in the southwest corner of section 77 by appellees was on account of an obligation made by and between appellees and the Pure Oil Company, as well as under the written contract dated April 9, 1935. Every undisputed fact in the record points to the conclusion that the discussion between Ogden and DeLange, during the month of March, 1935, was merely preliminary to the making of the written contract of April 9, 1935.

It is shown without dispute that appellees, on the 9th day of April, 1935, definitely determined with the Pure Oil Company to exercise their right to a "refusal" with reference to the south one-half of section 77, and in the contract of April 9, 1935, they protected themselves against the contingency in the delay of the completion of the well they were then drilling in section 41, in the commencement of the well in the southwest corner of section 77. The delay contingency agreement was obtained by DeLange subsequent to April 9, 1935, from Schoolfield and Frazier. Then, too, the record shows that after one of the appellees, Smith, acknowledged that he knew DeLange had the Bishop lease and the Moody lease, thereafter accepted assignments of oil and gas leases, which were provided for in the written contract of April 9, 1935. The written contract of April 9 gave appellees additional advantage over their alleged oral agreement in this, that it obligated DeLange to use his efforts to obtain an oil and gas lease on the 7-acre Eckdahl tract and to thereafter assign the same to appellees.

It is our understanding of the law that where one stands on performance to supply the want of mutuality of obligations in a contract, "that acts of performance must be sufficient to identify the contract in themselves, and with no other view than to fulfill the particular contract to be enforced." Clegg v. Brannan, 111 Tex. 367, 234 S.W. 1076, 1078.

In Ann Berta Lodge No. 42 v. Leverton, 42 Tex. 18, our Supreme Court said: "Acts done in performance, it has been justly observed, must be such as could have been done with no other view or design than to fulfill the particular contract sought to be enforced. A mere change of the possession and seizing of the land is an equivocal act, open to a variety of interpretations, and affords no presumption of a contract for the sale of the fee, but rather for a contract for a lease, either at will or from year to year."

We glean, therefore, from the authorities, that it would have been necessary for the appellees to sustain their position to prove the acts of performance relied on to have been done with no other view or design that to fulfill the particular oral contract sought to be enforced.

The alleged oral contract, if sustained, would establish a parol trust in realty. While it is clear from the authorities in this state that a parol trust in realty may be established by the oral testimony of one interested witness, 42 Tex.Jur., paragraph 77, and that it is the province of the jury to determine the weight to be accorded the interested witness' testimony, we think, however, there is enjoined by law in

392

this state a responsibility for the courts having jurisdiction on fact questions, that a parol trust must be established by clear and convincing testimony.

■ What we have heretofore said with reference to the oral testimony of Ogden showing lack of mutual assent of the parties and of the oral testimony on the grounds of uncertainty, and on the grounds of lack of mutual obligations, fully give our reasons for holding that the oral testimony offered by appellees is not sufficient to sustain a parol trust in realty.

By the fourteenth, fifteenth and other propositions, appellant complains of the sufficiency of the evidence to support the findings of fraud included in special issues Nos. 6, 7, 8, and 9. Special issues Nos. 7 and 8 submitted to the jury the question whether DeLange concealed from Hamill and Smith the fact that at the time of entering into the written contract, dated April 9, 1935, DeLange had a contract to acquire an oil and gas lease from the Bishop Cattle Company, covering 120 acres, known as the Bishop lease. Special issues 8 and 9, embrace the same inquiry applicable to concealment by DeLange of his intent to thereafter acquire the Moody lease; the appellees' theory being that the parol agreement hereinbefore referred to having been made by and between Ogden, acting for himself and Hamill and Smith, on the one side, and DeLange on the other, created the relation of DeLange being a trustee for appellees. Appellant contends that no oral agreement having been made, as aforesaid, that at the time of the contract dated April 9, 1935, the parties were dealing at arm's length, and that DeLange in fact owed the appellees no duty to disclose what leases he had, or what leases he intended to thereafter acquire. The appellant further contends that at the time of the contract of April 9th, he disclosed to Hamill and Smith the fact that he had a contract on the Bishop lease.

Our holding in regard to the insufficiency of the evidence in this cause to support the alleged oral agreement renders it unnecessary for us to discuss these propositions, except in a general way. In the absence of the alleged oral agreement between Ogden and DeLange, the findings of the jury are insufficient on the questions of fraudulent concealment. 15 Tex. Law Review, page 1.

■ The record is entirely silent as to any fraudulent concealment on the part of DeLange from Smith and Hamill on the date of the written contract of April 9, 1935. The trial pleadings of appellees do not pray for any cancellation or rescission of the contract of April 9, 1935. In fact, by that contract the appellees gained the contingency delay in the beginning of the well, as aforesaid, and received a complete assignment of valuable oil leases upon which at the time of the trial there were eight producing oil wells. The record does not show the value of the oil leases retained under the contract of April 9, 1935, by appellant. Before the contract could be set aside, we think the appellees would have to make and tender what they received under the contract. In other words, they cannot keep the benefits received under the contract and at the same time say that the contract is void on account of fraud.

Smith testified that before he received the assignment provided for in the contract of April 9, 1935, from DeLange to appellees, that he knew that appellant owned the Bishop and Moody leases, and it appears that DeLange delivered the assignments provided for in the April 9th contract by letter of May 21, 1935, and on July 29, 1935, in a letter to DeLange, signed by Hamill, among other things, it is stated: "We are very glad to hear that you have two wonderful wells, hope that you make a few millions and then that Huey Long forces you to divide with us." Apparently, after being successful in their drilling of the well in the southwest corner of section 77, and after having accepted the assignments provided for in the contract of April 9th, appellees seek to have DeLange divide with them the Bishop and Moody leases through the processes of the courts.

From what we have said, it becomes unnecessary to discuss other propositions raised by appellant.

The appellant asks that we reverse and render this cause. We have heretofore pointed out that the evidence offered by appellees to prove the alleged oral agreement is insufficient to sustain the judgment here entered. We have studied the evidence offered in this case with the view of determining our duty in regard to whether we should reverse and remand or reverse and render. To send this cause back to the trial court would give appellees another opportunity to do what the law required them to do on the first trial. The

evidence having been fully developed, we think this litigation should end; and, from the record before us, we have concluded that the cause should be reversed and rendered. It is accordingly so ordered.