## YERION v. ALLISON. (No. 1958.)

(Court of Civil Appeals of Texas. Amarillo. May 3, 1922.)

**1. Contracts ⬳9(2)—Contract held too indefinite to be enforced while executory.**

A contract by plaintiff to handle lands belonging to defendant and to render him financial aid until both parties could get some money from oil leases on the land was too indefinite as to what plaintiff would be required to do and as to the time it should be in effect to be enforced, while it remained executory.

**2. Contracts ⬳323(1)—Evidence of performance of contract to care for ranch and aid financially held not sufficient to go to the jury.**

In an action against a landowner on a contract to pay plaintiff half the proceeds of the sale of mineral leases for managing defendant's ranch, and giving defendant financial assistance, evidence that plaintiff had performed the contract on his part *held* insufficient to go to the jury.

**3. Frauds, statute of ⬳49—Contract for services and financial assistance to be paid for from proceeds of sale of oil leases held not within statute as to contracts not to be performed within a year.**

A contract whereby plaintiff was to manage defendant's ranch lands and furnish defendant financial assistance until defendant could sell oil leases on the lands when plaintiff was to receive one-half the proceeds of the sale of the leases, in view of the fact that oil speculation was active, and that there might have been a sale of the oil rights within a year and a complete performance of the contract, was not unenforceable as within Rev. St. art. 3965, subd. 5.

Appeal from District Court, Wichita County; E. W. Napier, Judge.

Action by J. W. Yerion against W. E. Allison. From judgment for defendant, plaintiff appeals. Affirmed.

Carrigan, Montgomery, Britain & Morgan and W. B. Chauncey, all of Wichita Falls, for appellant.

Fulton & Myers and Weeks, Morrow & Francis, all of Wichita Falls, for appellee.

BOYCE, J. J. W. Yerion brought this suit against W. E. Allison, to recover one-half of an amount received by Allison from the sale of oil leases on about 2,000 acres of land in Wichita, Clay, and Archer counties, Tex., owned by Allison. The court on the trial charged the jury peremptorily to find for defendant, and the plaintiff appeals.

[1] For cause of action the plaintiff alleged that the defendant was on November 15, 1913, the owner of about 2,000 acres of land in Wichita, Clay, and Archer counties, Tex.; that defendant was at such time in financial straits and in position to suffer great loss unless he was able to secure financial assistance; that on said date defendant entered into a verbal contract with the plaintiff, by the terms of which the plaintiff agreed to take charge of said lands and conduct a ranching business thereon; that "defendant would furnish plaintiff with funds with which to buy cattle to be placed upon said lands, and plaintiff should handle said cattle and land for defendant and should assist defendant in tiding over his financial difficulties until such time as defendant could raise money from the sale of oil, gas, and mineral rights in said lands, and that in consideration thereof the defendant was to pay plaintiff one-half of all the money which defendant would receive from the sale of the oil, gas, and mineral rights in said lands in any manner, and in the event there should be any net profits from the use of said land and cattle defendant was to receive up to $800 per year for the use of said land out of such profits, and, if the net profits should exceed $800 per year, then such excess of profits should be divided equally, and, in the event this manner of conducting said business did not pay the parties sufficiently, then plaintiff was authorized to rent said lands as he thought best"; that the plaintiff took charge of said lands in pursuance to this agreement and conducted a ranching business thereon until about November 1, 1917, at which time the land was by agreement between plaintiff and defendant leased to third parties for a period of three years; that the plaintiff in all respects complied with his part of the contract, and that during the year 1919 defendant sold oil and gas leases on said lands and received therefor

the total sum of $25,000; and that plaintiff is entitled to receive one-half of these funds. The defendant, in addition to a general denial and special pleas, not necessary to notice, pleaded that the contract was within the statute of frauds in that it was not to be performed within a year, and in that it provided for the sale of an interest in lands.

The plaintiff offered evidence to the effect that prior to November, 1913, he lived in Illinois, and the defendant in Indiana; that in November of said year the plaintiff and defendant entered into an agreement by the terms of which the plaintiff agreed to come to Texas and take charge of said lands and conduct a cattle business thereon as alleged; that the defendant represented that there was a loan against the land, and the loan company objected to renewing it unless he "stocked the place and ran it in a different manner from what he had"; that there was some "oil excitement" in that section at the time, and the defendant desired to hold the land until something could be realized from it from such source; that under the agreement the defendant was to receive the net profits yearly out of the cattle business up to $800; and that, if there were any net profits over this amount, they should be divided equally between the plaintiff and defendant. The plaintiff's testimony as to the agreement for division of the "oil money" realized from the land is thus stated:

"I said, 'Now, about the oil business.' He said, 'I will give you one-half of every dollar I get out of the oil game in any way, shape, or form off this land.'"

He further testified:

"With reference to how long this contract was to be carried on, well, we started into it to carry it until we could get some money out of the oil game and put us both in good shape. That was our idea."

The plaintiff did take charge of said lands and conduct a cattle business thereon until November, 1917, at which time, by mutual agreement, the lands were leased to third persons for a period of three years. Neither the pleading nor the evidence is definite as to what might be the duties of the plaintiff under the contract after the leasing of the lands. A settlement of the cattle business was had between the plaintiff and defendant. The plaintiff returned to Illinois, and had very little to do with any business in connection with the land thereafter. He had, prior to November, 1917, signed some notes with defendant for the purpose of securing money for defendant's use. These notes were renewed from time to time after the plaintiff's return to Illinois, until finally, in the spring of 1919, plaintiff learned that defendant was denying that he had any interest in the oil rights in the land and refused to sign further renewals of these notes.

About June, 1919, the defendant, without consultation with plaintiff, sold oil leases on a portion of the land and received therefor the sum of $25,000. Plaintiff claims that he is entitled to one-half of this amount.

The record does not disclose on what ground the trial court bases the peremptory instruction. Appellee presents numerous propositions in support of this action. Those particularly relied on are: (1) That the contract is too indefinite to be enforceable as an executory contract; (2) that the contract is within the statute of frauds in that it was not to be performed within a year from its date; (3) that the contract, as to the provision sued upon, is a contract for the sale of land and is within the meaning of the statute of frauds. We will consider these propositions in the order stated.

The contract is indefinite in several particulars:

First. As to the length of time that plaintiff was to handle the lands and render defendant financial aid. This time, according to the petition, was "until such time as defendant could raise money from sale of oil, gas, and mineral rights in said lands." The time, according to the proof, was "until we could get some money out of the oil game and put us both in good shape." No court could undertake to say how much money should be raised to satisfy these terms of the agreement.

Second, the agreement to "assist in tiding over defendant's financial difficulties." This further allegation of the plaintiff's pleading shows the construction which plaintiff himself put on this part of the agreement:

"Plaintiff says that he did in all respects comply with his part of the contract which he had with defendant, and that he did assist defendant in his financial trouble, and did assist and aid him in raising funds, and did sign numerous notes with him in order to save defendant from financial loss, until the defendant could raise sufficient funds from the sale of oil, gas, and mineral rights and leases in said lands."

It is clear also that no court could say with any certainty just what the plaintiff could be required to do in order to fulfill the obligation which he thus assumed.

Third. The contract as alleged is also indefinite as to what might be the plaintiff's duties in the event the cattle business should be terminated. This part of the contract was not proven, but it was shown that the cattle business was wound up by mutual agreement and the land leased, but the evidence is silent as to any understanding between the parties as to plaintiff's obligations with reference to the business thereafter.

Fourth. The contract is not certain as to just what money received from Allison out of the oil game should be paid to plaintiff. According to the allegations of the petition, the agreement perhaps would apply only to

money realized from the sale of oil and mineral rights. The agreement proven would be sufficient to embrace also money received as royalties from actual production and also what might be received from operation for oil, etc., conducted by Allison himself. The agreement also leaves us in doubt as to whether it was intended that these payments should be continued indefinitely as long as any such money should be received by Allison, and "after both parties had been put in good shape," and plaintiff's part of the contract had been fully performed.

[2] The provisions of the contract referred to were a material part of the plaintiff's obligations which formed the consideration for defendant's agreement sued upon herein. We think the contract was so indefinite, at least as to the first two particulars suggested, that, while it remained executory, it could not have been enforced. C. J. vol. 13, pp. 266–268; Page on Contracts, § 105; Elliott on Contracts, § 170 et seq.; R. C. L. vol. 6, p. 643. If, however, the plaintiff had done the things that he did as in complete and final performance of his part of the contract, and the defendant had accepted these as such performance, then the contract might be held to have been executed by the plaintiff. The objection as to the indefiniteness of his obligations would, by the acts of the parties, have been obviated, and the defendant would then be liable for the performance of his part of the agreement. Was there such a complete performance by plaintiff? It is not made clear, we think, either by the pleading or proof, that plaintiff's part of the contract was fully and finally performed when the cattle business was abandoned, and the land leased. The plaintiff testified that he decided to make a "change in the handling of the property," and further that "we decided we would lease the ground, as we could handle it better that way than we could handle cattle on it." While plaintiff was in Texas he attended to negotiations looking to the leasing of the oil rights on the land, and for a time after his return to Illinois such matters were discussed with him. He evidently considered that he had some continuing obligations under the contract. We quote the following from his testimony as supporting these conclusions:

"During this period of four years and afterwards I assisted Mr. Allison in tiding over his financial difficulties. I signed every note that he presented to me to be signed. * * * I never refused to sign any notes until after I learned that they were denying my interest in this oil money."

Again he testified:

"As I understand that agreement, if this land should be leased 20 years from now, I am to get one-half of that amount if I helped. I quit when I was denied my rights in this money, about March, 1919."

Again:

"With reference to what I did in 1918 toward leasing or trying to lease this land, I would not say, because we were writing letters and talking back and forth all the time, and I might have done something. I don't say that I did or did not in 1918, only still on the notes I was on."

The evidence shows that the plaintiff was informed some time before March, 1919, that defendant was denying that plaintiff had any further interest in the "oil game," and, as shown by the foregoing testimony, he then "quit" and refused to sign notes for Allison. While the testimony is not definite as to when the $25,000 was received from the sale of leases, we find no reference made to it as being in hand before June, 1919. It is also to be inferred that plaintiff had sold leases as to only a part of the land. As to how much it does not appear. If the plaintiff is to recover on the theory that his part of the contract had been fully and finally performed, he has the burden of establishing such fact. We do not think that he had discharged this burden, and we conclude that the court was for this reason justified in giving the peremptory instruction. The contract being indefinite, either party, while it was executory, could repudiate it, and his liability to the other party would be, not on the contract, but on quantum meruit.

[3] As to the second proposition we are inclined to think that the contract does not fall within the terms of the fifth subdivision of article 3965 of the Revised Statutes. While it was evidently contemplated that the contract would not be concluded within a year, yet the "oil excitement" was then on, and there might have been a sale of all the oil rights within the year and a complete performance of the contract by both parties. Thouvenin v. Lea, 26 Tex. 612.

The third proposition presents a question of considerable difficulty. Some authorities hold that an oral agreement providing for the disposition of the proceeds of the sale of lands may be enforced after the lands have been sold, notwithstanding the provisions of the statute of frauds. Logan v. Brown, 20 Okl. 334, 95 Pac. 441, 20 L. R. A. (N. S.) 298, and note; Zwicker v. Gardner, 213 Mass. 95, 99 N. E. 949, 42 L. R. A. (N. S.) 1160; 25 R. C. L. 540. The weight of the authorities perhaps sustain this general proposition, though there are other authorities to the contrary. Marvel v. Marvel, 70 Neb. 498, 97 N. W. 640, 113 Am. St. Rep. 792; Bryan v. Douds, 213 Pa. 221, 62 Atl. 828, 110 Am. St. Rep. 544, 5 Ann. Cas. 171. While most of the cases announcing the proposition above stated deal with agreements made before the acquisition of the title to the land which under the rule in this state would be enforceable even as to an interest in the

land itself, the principles on which they were decided might be applicable in this case. In the case of Dietrich v. Heintz, 44 Tex. Civ. App. 602, 99 S. W. 417, in which writ of error was denied, the defendant employed the plaintiff to manage her business, agreeing "to give him an interest in the premises to the extent of $4,000, which he should receive from any sale of the lot." The suit was to recover the $4,000 on this agreement after the sale of the lot, and it was held that the agreement was for the sale of an interest in land, and, being oral, was unenforceable as against the proceeds. We doubt whether any substantial distinction may be drawn between that case and this, and, under the limited consideration which we have given to the question, would be inclined to hold that this authority sustains the action of the trial court. However, we place our disposition of the case on the first proposition discussed.

The judgment will be affirmed.